IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOHN DOE,                                    )
                                             )
        Plaintiff,                           )
                                             )
vs.                                          )        Civil Action No. 8-823
                                             )
FAYETTE COUNTY CHILDREN AND                  )
YOURTH SERVICES, *et al.,*                   )
                                             )
        Defendants.                          )

AMBROSE, District Judge

**OPINION**
**and**
**ORDER OF COURT**

**SYNOPSIS**

The parties have filed cross motions for summary judgment. (Docket Nos. 41 and 44). The
parties have also responded in opposition thereto. After careful consideration as more fully set forth
below and based on the submissions of the parties, Plaintiff's Motion for Summary Judgment (Docket No.
44) is granted in part and denied in part and Defendants' Motion for Summary Judgment (Docket No. 41)
is denied.

**OPINION**

**I.        BACKGROUND**

Plaintiff, John Doe, is a resident of Fayette County, Pennsylvania. Plaintiff has a high school
education. Plaintiff was married to Jane Doe but they separated in 2005. They are the parents of three
children who at all relevant times were under the age of ten. The children have little contact with their
mother, Jane Doe. The three children lived with Plaintiff.

David Madison was the Fayette County Children and Youth Services ("FCCYS") administrator.
Rebecca Plichta was the intake supervisor for FCCYS. Gina D'Auria was the FCCYS case manager and
Plichta's direct supervisor. Brian Davis was a caseworker for FCCYS from February 2004 until May 2007.
Kim Schuessler worked at FCCYS from April 2001 to October 2007. In November 2006, she switched
from the foster care unit to the intake unit. Renee Coll was a caseworker for FCCYS from June 2007
through June 2008.

On Friday, September 22, 2006, Davis received a report about suspected child abuse that was made to the FCCYS office at 9 a.m. stating that K.K., a sixteen year old female, was living with Plaintiff and having a sexual relationship with him. K.K. was not related to Plaintiff but had lived in his house with her father, her father's girlfriend, and her siblings from the end of May 2006 until August 2006 due to the lack of electricity where K.K. and her family had lived.

K.K. had disclosed the relationship to her mother, who told her that she could no longer see Plaintiff. K.K. then became suicidal and was admitted to Highlands Hospital and subsequently transferred to Clarion Psychiatric Hospital, which is where she was when the report was made to FCCYS.

After receiving the report, Davis called Clarion County CYS and asked that a caseworker there visit K.K. at the hospital. Davis also called the Belle Vernon station of the Pennsylvania State Police to report the abuse allegation. He then called K.K.'s father to arrange for K.K. to be interviewed at CYS the following Monday, September 25, 2006.

On September 22, 2006, Davis also made a telephone call to Plaintiff's home to notify him that FCCYS had received a report of suspected child abuse regarding his relationship with K.K. During the call, Davis informed Plaintiff that as a result of the investigation, the agency was requesting that his children reside elsewhere. Davis requested that Plaintiff find another place for his children to live because it was FCCYS' standard practice to request that alleged perpetrators of sexual abuse not have contact with their children during an investigation. Plaintiff told Davis that his children could stay with his parents. At the time, his son was 6 and his daughters were 4 and 3. Davis did not tell Plaintiff that he could not have contact with his children because Davis believed that it would be okay for the children to see their father as long as their contact with him was supervised by Plaintiff's parents. The telephone conversation lasted about 10 minutes.

Davis then called Plaintiff's parents to ask if Plaintiff's children could stay with them. Plaintiff's father agreed that the children could stay and that the children would not be unsupervised with their father. David did not inspect or visit Plaintiff's parents' house before the Plaintiff's children left Plaintiff's home to stay with them.

Davis met with K.K. and a Pennsylvania state trooper on September 25, 2006. At that time, K.K. told them that she did not have sex with Plaintiff prior to her 16th birthday. K.K. turned 16 on September 12, 2006.

Davis set up a meeting with Plaintiff at the FCCYS office for September 29, 2006. According to Davis, the purpose of that meeting was to solidify the safety plan that he and Plaintiff had verbally agreed to on the phone and put it in writing.

A safety plan is written agreement between the parties to keep children safe during an assessment or an investigation. FCCYS safety plans do not always involve separation of parents and children; instead, safety plans should establish "the least restrictive measures necessary to assure safety" of children. (Docket No. 47-2, p. 4).

At the meeting, Davis explained to Plaintiff that under the safety plan his parents were required to be present whenever he saw his children. That meant that Plaintiff would be in violation of the safety plan if he was in his parents' living room with his children while his parents were in their bedroom. Both Plaintiff and Davis signed the safety plan ("2006 safety plan"). This 2006 safety plan was reviewed and approved by Davis' supervisor at the time.

At that time, Davis was not aware of any allegations that the Plaintiff's children had been abused.

Davis did not explain anything further to Plaintiff because Plaintiff left the meeting.

On October 11, 2006, Davis visited Plaintiff's parents' home to inspect their house to ensure that it was safe, that the children had a place to sleep, and that there was enough food to eat. There is no evidence that Davis saw or spoke with Plaintiff's children at this or any other time.

On October 30, 2006, Plaintiff's father spoke with Davis at the FCCYS office. He reported to Davis that over the weekend Plaintiff had made threats against Davis and his family. Davis reported the threats to the state police. Plaintiff pled guilty to his threats against Davis. After Davis finished his investigation, he separated himself entirely from the case.

On November 17, 2006, Davis sent Plaintiff a letter notifying him that FCCYS determined that substantial evidence existed to indicate he committed sexual abuse of K.K.. The "indicated report" was to be maintained in the Statewide Central Register. The indicated report was filed by Davis and approved by Plichta.

An "indicated report" is a child abuse report made pursuant to the Child Protective Services Law if an investigation by the county agency or the Department of Public Welfare determines that substantial evidence of the alleged abuse exists based on available medical evidence, the child protective service investigation, or an admission of the acts of abuse by the perpetrator. "Child abuse" includes any recent act or failure to act by a perpetrator which causes nonaccidental serious physical injury to a child under 18 years of age; an act or failure to act by a perpetrator which causes nonaccidental serious mental injury to or sexual abuse or sexual exploitation of a child under 18 years of age; or any recent act, failure to act or series of such acts or failures to act by a perpetrator which creates an imminent risk of serious physical injury to or sexual abuse or sexual exploitation of a child under 18 years of age. A perpetrator is a person who has committed child abuse and is a parent of a child, a person responsible for the welfare of a child, and individual residing in the same home as a child or a paramour of a child's parent. Any person named as a perpetrator in an indicated report of child abuse may, within 45 days of being notified, request the report be amended or expunged on the grounds that it is inaccurate.

Plaintiff exercised his right to a hearing to determine whether the indicated report should be expunged. The Commonwealth Court ultimately granted Plaintiff's request to expunge the indicated report on May 19, 2009. The Commonwealth Court denied an application for reargument on July 16, 2009. On December 1, 2009, the Pennsylvania Supreme Court rejected FCCYS' petition for allowance of appeal.

From September 2006 to August 1, 2007, Plaintiff obeyed the 2006 safety plan's requirement that he avoid any unsupervised contact with his children. The children continued to live with Plaintiff's parents, and Plaintiff visited them every day under the supervision of his parents. At no point between September 2006 and August 2007 did any FCCYS employee believe that Plaintiff had abused or mistreated his children in any way. No one from FCCYS had any contact with Plaintiff, his parents, or his children between December 2006 and July 31, 2007.

On Wednesday, August 1, 2007, Schuessler, the on-call caseworker, received a report that Plaintiff was having contact with his children. Schuessler spoke with D'Auria. Then Schuessler called the Pennsylvania State Police. Schuessler, accompanied by two Pennsylvania State police, arrived at Plaintiff's parent's home between 10:00 p.m. and midnight to inform Plaintiff's parents that Plaintiff was

not allowed to have any contact with his children. Schuessler told Plaintiff's parents that she had just discovered that Plaintiff was having supervised visitation with his children and that because Plaintiff was an indicated perpetrator of sexual abuse, such supervised visitation violated FCCYS' protocol because Plaintiff had not completed treatment.

The Protocol was developed by the Agency's policy committee and was adopted by FCCYS in 1996. The Protocol applies whenever a perpetrator of sexual abuse (indicated or founded), who is not receiving treatment, is living with, providing care for, or having contact with a minor child. It applies regardless of how long ago the abuse occurred. The Protocol states, in part, that:

> Imminent risk of sexual abuse is interpreted to mean the following:
>
> There must be substantial evidence that an action on the part of the alleged perpetrator placed the child at imminent risk of sexual abuse/exploitation; or
>
> There must be substantial evidence that the alleged perpetrator had known or should have known of the risk of sexual abuse and failed to exercise reasonable judgment in preventing such risk.

(Docket No. 50, p. 18). The purpose of the Protocol is "to outline the policies and procedures for sexual offenders and children. It is the first and foremost purpose of the Agency to assure that children are safe in their homes. *Id.*

The Protocol also provides the following:

> In the event that the agency receives information that a perpetrator of sexual abuse is living with, providing care for, or having contact with a minor child the following will occur:
>
> ●An immediate response to the report will occur. The Agency Caseworker will review all agency data bases, Meagan's Law Web Site and Court information to verify the information received. The assigned intake caseworker will then attempt to locate the child.
>
> ● An interview will occur with the child to determine if the perpetrator has had or currently has access to the child.
>
> ● An interview will occur with the parent to determine if they had any knowledge of the offenses.
>
> ● An interview will occur with the offender to determine if he/she is aware that they are not permitted access to a child. Further it will be determined if the offender has completed any form of offenders counseling.
>
> ● A safety plan will be developed with the family and offender. Until such time that treatment and recommendations can be verified, the sexual offender will not be permitted to have contact with children.

● If the family and or offender refuse to abide by the safety plan the caseworker will contact the police in order to assess for protective custody of the child.

● In the event that counseling has been obtained a release will be requested to determine the appropriateness of counseling as well as the compliance with treatment. The caseworker will make contact with the therapist for a recommendation.

● In the event that an individual has not received treatment the individual will not be permitted to have contact with any child until such time that successful completion of treatment or recommendation by a recognized offender's therapist that the individual is permitted to be around children.

● FCCYS will make a referral for evaluation or treatment as deemed appropriately.

● In the event that treatment and/or assessment has been obtained all recommendations will be followed and included in the safety plan.

*Id.* at 19.  The Protocol was reviewed and approved by Madison.  FCCYS does not have any training materials related to the Protocol.

Schuessler provided Plaintiff's parents with a new safety plan ("August 1, 2007, safety plan"). She explained to Plaintiff's mother that if she did not agree to the safety plan, the police were there to assess for protective custody and that if they felt the children were not safe, they could remove the children to protective custody or CYS could file a petition with the court.  The August 1, 2007, safety plan required Plaintiff's parents to prohibit all contact between Plaintiff's children and Plaintiff, including "face-to-face, telephone, e-mail, or third-party messages."   (Docket No. 49, p. 25).  The consequences for failing to abide by the August 1, 2007, safety plan include FCCYS taking court action to obtain the parents' cooperation and the removal of the children from the home for foster care placement.

Plaintiff's mother signed the safety plan, telling Schuessler that she and her husband would do whatever the agency requests "as they will not risk losing the children over the situation."   If Plaintiff's mother had refused to sign the safety plan at that time, Schuessler would have asked the police to assess for protective custody.

During this time the children were asleep.  Schuessler looked in on the children but did not talk to them.

Schuessler did not know that there was a prior written safety agreement between FCCYS and Plaintiff nor was she aware of what the previous caseworkers did.  She based her response to the report about Plaintiff's contact with his children on FCCYS' Protocol for Sexual Offender and Contact with Children ("Protocol").  The only reason the FCCYS asked Plaintiff's parents to sign the August 1, 2007,

safety plan prohibiting all contact between Plaintiff and his children was because Plaintiff had been indicated as a perpetrator of sexual abuse for his relationship with K.K. and under the Protocol he cannot have any contact with any children.

Plichta assigned Plaintiff's case to Coll. On August 2, 2007, Plaintiff telephoned Schuessler to determine why he could not have supervised contact with his children. He was transferred to Coll. During his conversation with Coll, Coll asked Plaintiff to agree to a safety plan barring him from having any contact with his children. Coll read the safety plan over the telephone ("August 2, 2007, safety plan").

The August 2, 2007, safety plan stated as follows:

[Plaintiff] may not have any form of contact with ANY child pending successful completion of sexual offender's treatment program. I understand that I must provide verification of the completion of treatment, in writing, prior to having contact with any child. I understand that contact includes but is not limited to face to face, telephone, e-mail, letter, or third party messages.

I further understand that failure to abide by this safety plan will result in the Agency taking court action against me which may include the removal of my child/ren from my home for foster care placement.

(Docket No. 49, p. 26). At the time of that call, Plaintiff had already spoken to his mother about the circumstances of Schuessler's August 1, 2007, visit to his parents' home and knew that his mother had signed a safety plan requiring her to bar all contact between Plaintiff and his children. Thus, Plaintiff agreed to the August 2, 2007, safety plan.

Coll did not provide any information to Plaintiff about what court action the agency might take if he had contact with his children. Coll testified that she believed that agency policy required her to seek a safety plan requiring no contact with any child because Plaintiff was an indicated perpetrator of sexual abuse. Coll did not know at that time the basis for Plaintiff's indication.

On August 3, 2007, Plaintiff called Coll to ask her what he had to do to have contact with his children. She told Plaintiff that the first step was to get an assessment from George Yatsko. She also told Plaintiff that he would need to be in the offender's program to qualify for supervised contact with his children. She provided Yatsko's number to Plaintiff after he requested it.

On August 22, 2007, Coll conducted a scheduled home visit with Plaintiff. She explained to Plaintiff that although Davis had told him he could have supervised contact with his children, that was not the policy of the agency. Coll gave Plaintiff no reason other than the Protocol for why he could no longer

have contact with his children.  She also handed him a non-discrimination policy and reiterated that he needed to have an assessment by Yatsko and to follow Yatsko's recommendations.  She did not provide any further information to Plaintiff regarding his rights.  Madison testified that he was not aware of any information that FCCYS is legally required to provide to parents at the time they are asked to sign a safety plan.

On August 23, 2007, Plaintiff left a voice mail for Coll that he had scheduled an assessment with Yatsko.

Yatsko is a counselor who has a master's degree in science and education with an emphasis on community counseling.  He is not a psychologist, psychiatrist, or a social worker.  He does not have a doctorate degree or any professional certification or license.

Yatsko has been under contract with FCCYS since 1989 to provide, *inter alia,* sex offender counseling.  He was the only counselor under contract to provide treatment for Fayette County at the time.  Yatsko's 2007 contract with Fayette County provided that he would receive $55.00 for every hour of group therapy he provided, regardless of the number of people in each session.  He also received $55.00 per hour for every hour of individual counseling he provided.  He offers a two-hour group therapy session for sex offenders once a weeks and individual counseling on an as-needed basis.

Attendance at the group therapy session is required.  To be a part of the program, participants must adhere to the following: no alcohol or drugs, no pornography, never be alone with someone under the age of 18 unless it is allowed by CYS, and never touch someone under the age of 18 unless CYS is aware of it.

Yatsko's first contact with Plaintiff was August 21, 2007, during a group sex offender counseling session.  After the meeting, Yatsko met with Plaintiff individually for approximately one hour and forty minutes.  Yatsko was aware during that meeting that the basis for FCCYS' filing of the indicated report on Plaintiff was that he had a relationship with a teenage female who looked older.  Based on his meeting with Plaintiff, Yatsko told FCCYS that he did not believe that "we were going to have to worry much about prepubescent children as much as impulse control for older teenage girls."   At the time of the meeting Yatsko had not had any contact with Plaintiff's parents or his children, but he did know that he had not been accused of abusing his own children.   Plaintiff claims that Yatsko told him that while he could get

his children back, he would never be allowed to be alone with them. At the end of the meeting, Yatsko enrolled Plaintiff in the program.

On August 28, 2007, Yatsko left a voice mail message for Coll stating that he assessed Plaintiff at a very low risk with prepubescent children. Also on August 28, 2007, Plaintiff told Coll that based on the advice of his attorney, he was not going to attend any more sex offender counseling sessions with Yatsko. Coll then called Plaintiff's attorney who confirmed that he had advised Plaintiff not to attend the program due to Yatsko's requirement that participants admit to being perpetrators of abuse. He told Coll that if Plaintiff admitted to being a perpetrator, it would destroy his appeal. Coll told him it was the agency's policy that Plaintiff could not have supervised visits with his children unless he was attending the program.

On September 11, 2007, Coll and Plichta had a phone call with Yatsko because there was some confusion about whether Plaintiff needed to be in the sex offender program. Plichta explained to Yatsko that Plaintiff was refusing to participate in the program based on his attorney's advice. At that time Plichta was aware that Yatsko had said that Plaintiff was at low risk to re-offend. She was also aware that Plaintiff's attorney advised him not to participate in the program because he believe that as part of the program participants are required to admit the facts underlying the agency's basis for the indicated report, which could be held against the person in future proceedings, including Plaintiff's appeal of the indicated status.

On September 11, 2007, Coll called Plaintiff's attorney and explained that it was FCCYS policy that Plaintiff have no contact unless he was in a treatment program. He responded that Plaintiff would not be attending the program.

On September 13, 2007, Coll visited Plaintiff's parents' home. She met with the two oldest children and took pictures of them all. This was the first time that anyone for FCCYS spoke with any of Plaintiff's children. Coll told Plaintiff's parents that because he had refused to participate in the sex offenders program, he was not permitted to have any contact with his children. She informed them that Plaintiff's appeal could take months or years and asked if they could keep the children until then. She presented a final safety plan ("September 13, 2007, safety plan") to Plaintiff's parents that prohibited all contact between Plaintiff and his children until further notice from FCCYS. (Docket No. 49, p. 27). The

September 13, 2007, safety plan stated in part that "[f]ailure to abide by this safety plan will result in the Agency taking more stringent actions to assure the safety" of Plaintiff's children. *Id.* Plaintiff's parents signed the September 13, 2007, safety plan.

On September 18, 2007, FCCYS closed Plaintiff's case without services because Plaintiff was not participating in the sex offenders program. The decision not to accept Plaintiff for services was approved by Plichta but could have been overridden by D'Auria or Madison. Coll notified Plaintiff and Plaintiff's parents of the closure via letters. (Docket No. 49, pp. 33-34). The letter stated that the safety plans would remain in effect until further notice from FCCYS. *Id.*

Coll had no opinion about whether it was necessary to prohibit contact between Plaintiff and his children. She did not have any concerns about the effect on Plaintiff's children of not being able to see their father because she was following agency policy. The only documents that Coll was required to provide to Doe during the pendency of his case were a copy of the safety plan that he signed, the agency's non-discrimination policy, and a case closure letter.

Plaintiff believed that when FCCYS caseworkers told him his children could be taken into protective custody if he violated the safety plan that they were referring to foster care. When a child is placed in out-of-home care, FCCYS must give first consideration of placement to relatives before other resources for placement are explored. No one from FCCYS informed Plaintiff that his children could be placed with his parents if they were taken into emergency protective custody or adjudicated dependent.

Based on the safety plans in place, Plaintiff had no contact with his children from August 2, 2007 until June 19, 2008 (with one exception when he accidently saw his daughter at a Wal-Mart in the spring of 2008).

Plaintiff took the separation from his children extremely hard and sought counseling for suicidal thoughts and depression stemming from the separation. In late 2007, Plaintiff admitted himself three times for a week each to the Highlands Hospital psychiatric unit as a result.

On June 16, 2008, Plaintiff filed this lawsuit. Less than a week after he filed the lawsuit and while a motion for preliminary injunction was pending, FCCYS allowed Plaintiff to have supervised contact with his children without the condition that he participate in the sex offender program. On June, 20, 2008, Plaintiff met with Plichta and D'Auria at his parents' home to establish a new safety plan that would permit

him to have supervised contact with his children.  On August 1, 2008, as part of an agreement between the parties pursuant to this lawsuit, FCCYS allowed Plaintiff to have unlimited unsupervised contact with his children.

Plaintiff was never charged with any criminal offense for having sex with K.K. because it could not be proven that K.K. was less than 16 years old at the time of the sexual activity.  (Sixteen is the age at which minors may consent to sexual activity in Pennsylvania regardless of the age of their partner.)

The Amended Complaint sets forth the following four counts: 1) 14th Amendment procedural due process claim against Defendants for failure to provide Plaintiff a hearing, either before or after the children were placed with his parents; 2) 14th Amendment substantive due process claim for violating his right to the custody, care and control of his children via the policy and Defendant's alleged threats to place the children in protective custody if he had any contact with them; 3) 1st Amendment claim for violating his right to associate with his children via the policy; and 4) 5th Amendment claim for violating his privilege against self-incrimination.

The parties have filed cross motions for summary judgment.  (Docket Nos. 41 and 44).  The issues are now ripe for review.

## II.    LEGAL STANDARD

Summary judgment may only be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c). Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).

In considering a motion for summary judgment, this Court must examine the facts in a light most favorable to the party opposing the motion.  *International Raw Materials, Ltd. v. Stauffer Chemical Co.,* 898 F.2d 946, 949 (3d Cir. 1990).  The burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact.  *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir. 1987).   The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the

non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is material when it might affect the outcome of the suit under the governing law.  Id.  Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial.  *Celotex,* 477 U.S. at 322.

Once the moving party satisfies its burden, the burden shifts to the nonmoving party, who must go beyond its pleadings, and designate specific facts by the use of affidavits, depositions, admissions, or answers to interrogatories showing that there is a genuine issue for trial.  *Id.* at 324.  Summary judgment must therefore be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *White v. Westinghouse Electric Co.,* 862 F.2d 56, 59 (3d Cir. 1988), *quoting, Celotex*, 477 U.S. at 322.

### III.     Plaintiff's Motion for Summary Judgment (Docket No. 44)[1]

Plaintiff raises two primary issues in his Motion.  (Docket Nos. 44 and 54).  As set forth above, while addressing Plaintiff's issues, I will view the evidence in the light most favorable to Defendants.

### A.     The Fourteenth Amendment Due Process Rights

The Third Circuit has succinctly set forth the process for assessing a due process claim.

> The Fourteenth Amendment prohibits state action which "deprive[s] any person of life, liberty, or property, without due process of law." To enable individuals to enforce these rights, Congress enacted § 1983 as a federal cause of action against deprivation of any rights, privileges, or immunities secured by the Constitution or laws of the United States. To state a § 1983 claim, Plaintiffs must demonstrate that Defendants, acting under the color of state law, deprived Plaintiffs of a right secured by the Constitution or the laws of the United States. . . .

*Culinary Service Of Delaware Valley, Inc. v. Borough Of Yardley*, No. 09-4182, 2010 WL 2600683, *4 (3d Cir. June 30, 2010) (citations omitted).  The 14th Amendment provides both a substantive and a procedural due process right.  *Troxel v. Granville,* 530 U.S. 57, 65 (2000).  In this case, Plaintiff's due process claims against Defendants are rooted in the constitutionally protected liberty interest of familial integrity.  *See, Croft v. Westmoreland County CYS,* 103 F.3d 1123, 1125 (3d Cir. 1997) (*citing Lehr v.*

---

[1] To the extent that an argument is raised by Plaintiff and Defendants, I consider it under Plaintiff's Motion, thereby viewing the evidence in the light most favorable to Defendants.  If an argument is not properly raised by Plaintiff, I will consider it under Defendants' Motion, thereby viewing the evidence in the light most favorable to Plaintiff.

*Robertson*, 463 U.S. 248, 258 (1983). A parent has a fundamental liberty interest in the companionship, care, custody, and management of his or her children. This liberty interest, however, is "not absolute." *Id.* Courts "must balance the fundamental liberty interests of the family unit with the compelling interests of the state in protecting children from abuse." *Id.* Thus, governmental interference in familial relationships must adhere to the requirements of procedural and substantive due process. *Id.*

### 1.   Substantive Due Process

Plaintiff first argues that "Defendants' threats to have [Plaintiff's] children placed in protective custody unless he relinquished physical custody of his children and cut off all contact with them violated [his] substantive due process rights." (Docket No. 54, p. 9). Initially, Plaintiff argues that the standard to apply to the acts of the officials is different from the standard applied to the policy or legislative act at issue. (Docket No. 54, pp. 10-11). He suggests that the acts of the officials must be so arbitrary that they "shock the conscience," and the policy is subject to a higher stander and must be narrowly tailored to a compelling governmental interest. *Id.* The Third Circuit Court has stated that the standard to apply for substantive due process claims arising out of a custom, practice or policy is a "shock the conscience" standard. *Studli v. Children & Youth and Families Central Regional Office*, No. 07-4831, 2009 WL 2873306, 5, 346 Fed. Appx. 804, 812 (3d Cir. Sept. 9, 2009) ("Studli's allegations do not rise to the level of a substantive due process violation unless CYS' policy of allowing placement of a child outside Somerset County in some circumstances is a custom, practice or policy that 'shocks the conscience.'"). Thus, "to support a substantive due process claim [whether it be a policy/protocol or an act by an official], the government conduct must be "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Roberts v. Mentzer,* No. 09-3251, 2010 WL 2113405, *4 (3d Cir. May 27, 2010) *(citing, Kaucher v. County of Bucks*, 455 F.3d 418, 425 (3d Cir. 2006)).

### i.   The Protocol

The policy at issue is the Protocol used by FCCYS when it receives a report that someone who has been listed on ChildLine as an indicated perpetrator of sexual abuse is living with, providing care for, or having contact with a minor child – FCCYS' Protocol for Sexual Offenders and Contact with Children ("the Protocol"). (Docket No. 47-2). The Protocol provides, *inter alia,* as follows:

> In the event that the agency receives information that a perpetrator of sexual abuse is living with, providing care for, or having contact with a minor child the following will occur:

*    *    *

°   A safety plan will be developed with the family and offender. Until such time that treatment and recommendations can be verified, the sexual offender will not be permitted to have contact with children.

*    *    *

°   In the event that an individual has not received treatment the individual will not be permitted to have contact with any child until such time that successful completion of treatment or recommendation by a recognized offender's therapist that the individual is permitted to be around children.

(Docket No. 47-2, pp. 1-2). "If the family and or offender refuse to abide by the safety plan the caseworker will contact the police in order to assess for protective custody of the child." *Id.* at p. 2.

Caseworkers are required to apply the Protocol to all persons listed as indicated perpetrators of sexual abuse, regardless of how long ago the abuse occurred, if they are living with, providing care for, or having contact with a minor child. The background for the Protocol is to protect children who are at "imminent risk of serious injury or sexual abuse or sexual exploitation." Imminent risk is interpreted by FCCYS as the following: 1) There must be substantial evidence that an action on the part of the alleged perpetrator placed the child at imminent risk of sexual abuse/exploitation; or 2) There must be substantial evidence that the alleged perpetrator had known or should have known of the risk of sexual abuse and failed to exercise reasonable judgment in preventing such risk." (Docket No. 47-2, p. 1). Yet, the Third Circuit has stated that:

a state has no interest in protecting children from their parents unless it has some reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse.

*Croft v. Westmoreland County CYS,* 103 F.3d 1123, 1126 (3d Cir. 1997).

Applying the shocks the conscience standard and viewing the evidence in the light most favorable to Defendants, I find that there is no genuine issue of material fact that the Protocol of prohibiting all contact with any child until such time that an indicated perpetrator of sexual abuse successfully completes treatment shocks the conscience. Under FCCYS' Protocol, there is no ability for a caseworker to make a considered judgment to determine if the child is at "imminent risk of sexual abuse." It simply assumes that if a person is an indicated perpetrator of sexual abuse, all children are at imminent danger of abuse without reasonable and articulable evidence giving rise to a reasonable suspicion that the child is at

imminent danger of abuse and, then, completely severs all contact between parent and child. There is zero room for individualized consideration of the facts of each case or whether limited contact in some form may be warranted. While FCCYS has a compelling interest in protecting children from imminent danger of abuse, the ends cannot justify the means. *See, Stanley v. Illinois*, 405 U.S. 645, 657 (1972) ("Procedure by presumption is always cheaper and easier than individualized determination. But when, as here, the procedure forecloses the determinative issues of competence and care, when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child. It therefore cannot stand").

This case is the perfect example of a situation where the Protocol is conscience shocking. Here, while there was an allegation that Plaintiff had sexual contact with a minor that was not his child, Defendants had no evidence that Plaintiff had abused or mistreated his children. (Docket Nos. 46 and 55 at ¶92). FCCYS did not seek to have his children evaluated by a psychologist to ensure that there was no abuse. Moreover, as of September 22, 2006, Plaintiff was operating without incident under the 2006 safety plan that FCCYS had developed that allowed him supervised visitation with the children who were living with Plaintiff's parents. No one from FCCYS had any contact with Plaintiff, Plaintiff's parents, or Plaintiff's children between December 2006 and July 31, 2007. Yet for no reason, other than the Protocol, on August 1, 2007, Kim Schuessler, accompanied by two Pennsylvania State police, revoked the "safety plan in place" and informed Plaintiff's parents that he was not allowed to have *any* contact with his children. (Docket Nos. 46 and 55, ¶94). Thereafter, on August 21, 2007, Plaintiff met with George Yatsko, FCCYS' counselor for sex offenders. Mr. Yatsko reported to FCCYS that in his opinion Plaintiff was unlikely to offend a prepubescent child. (Docket No. 45 and 55, ¶¶151, 166, 170). Yet, Plaintiff was still not permitted any contact with his children under the Protocol because he did not successfully complete treatment by, *inter alia,* "taking responsibility" for his actions. (Docket No. 47-11, p. 30).

In opposition, Defendants suggest that the policy does not shock the conscience because "it merely sets forth the appropriate procedure for caseworkers to follow in cases in which sex offenders are having contact with children." (Docket No. 56, p. 6). I disagree. As set forth above, the Protocol presumes, without more, that in every case where there is an indicated perpetrator there is substantial evidence that all children are at imminent risk and all contact must be severed until, at the earliest, an

offender has successfully completed counseling treatment or recommendation by a recognized offender's therapist that the individual is permitted to be around children. (Docket No. 47-2).

Defendants also suggest that there are individual assessments made in each case. (Docket No. 56, pp. 9-10). These assessments, however, are not made until after the presumption of imminent risk attaches and *all* contact is severed. Thus, to argue that "[d]epending on the risk a particular situation presents, more *or less* contact with children can be recommended" is disingenuous since *all* contact has already been prohibited. (Docket No. 56, p. 9 emphasis added). Automatically terminating *any and all* contact between a parent and child based solely on a protocol that presumes when a parent has been indicated as a perpetrator of sexual abuse of a minor (whether his child or not) all other minors are at imminent risk of danger, is too broad, unreasonable, ignores alternatives, is inflexible and completely devoid of assessments on a case-by-case basis. It is an arbitrary abuse of power. *See, Croft,* 103 F.3d 1123, 1126. Simply put, I find that there is no genuine issue of material fact that the total ban on all contact based on said presumption is conscience shocking and, in this case, violates Plaintiff's fundamental parental rights. Therefore, summary judgment in favor of Plaintiff is warranted on the ground that FCCYS' Protocol violates Plaintiff's substantive due process.

ii.   The Individual Defendants

Next, Plaintiff argues that the caseworkers' threats to remove Plaintiff's children if he did not relinquish his rights to the custody and companionship of his children violated his substantive due process rights. (Docket No. 54, pp. 22-29). There are three possible standards to determine whether behavior of the FCCYS employees rose to the level of conscience-shocking: 1) deliberate indifference; 2) "gross negligence or arbitrariness that indeed 'shocks the conscience"; and 3) intent to cause harm. *Sanford v. Stiles*, 456 F.3d 298, 306 (3d Cir. 2006). The appropriate level turns on the urgency of the situation. *Id.* If there is "time 'to make unhurried judgments'" deliberate indifference applies. *Id.* A social worker's action leading to an emergency order to separate a parent and child is subject to the gross negligence or arbitrariness that indeed shocks the conscience. *Id.; see also, Miller v. City of Philadelphia*, 174 F.3d 368, 375-76 (3d Cir. 1999). Plaintiff argues that with the exception of Davis' initial conduct in achieving a separation between Plaintiff and his children in which gross negligence or arbitrariness that indeed shocks the conscience applies, the deliberate indifference standard applies to the other

Defendants since they all had time to make unhurried and deliberate judgments before taking action. (Docket No. 54, pp. 22-23). Defendants do not respond to this and simply apply the conscience shocking standard generically. Based on the case law above, I agree with Plaintiff that there are varying degrees and will apply them as the situation demands.

a)     Brian Davis

With regard to Mr. Davis' initial conduct in Plaintiff's case, Plaintiff concedes that the "indeed shocks the conscience" standard applies. Then, in two sentences in a footnote, Plaintiff argues that it "was not objectively reasonable for Davis to believe that [Plaintiff's] children were in imminent danger of abuse if they had unsupervised contact with their father." (Docket No. 54, p. 23, n. 47). This argument is completely underdeveloped. In the absence of any substantive or meaningful analysis of the same, this assertion is inadequately put before me. *See, Pennsylvania v. U.S. Dept. of Health & Human Serv.*, 101 F.3d 939, 945 (3d Cir. 1996)(stating that conclusory assertions, unaccompanied by a substantial argument, will not suffice to bring an issue before the court). Consequently, I find this argument to be waived and decline to address it at this point.

Next, Plaintiff argues that Mr. Davis' failure to revise the 2006 safety plan once he had an opportunity to investigate the allegations against Plaintiff and his relationship with his children was deliberately indifferent to the risk that the restrictions placed on Plaintiff's contact with his children violated his parental rights. (Docket No. 54, pp. 23-24). Plaintiff takes issue with the fact that Mr. Davis never interviewed his children and never requested that the children be interviewed by a psychologist to determine if they were abused or at risk of being abused. *Id.* Additionally, Plaintiff points to the Commonwealth Court's subsequent opinion as evidence that Mr. Davis' belief was not reasonable. *Id.* Viewing the facts in the light most favorable to Defendants and applying the "deliberate indifference" standard to Mr. Davis' subsequent conduct in Plaintiff's case, however, I find there remain genuine issues of material fact prohibiting summary judgment.

Both Plaintiff and K.K. admitted to having sexual relations. While they both stated that they waited until Plaintiff was 16, Mr. Davis was entitled to view the statement with skepticism. *Croft,* 103 F.3d at 1127. In fact, according to Mr. Davis, K.K. stated during her interview that she had sex with Plaintiff when she was living with him. (Docket No. 47-7, p. 14; Docket Nos. 42 and 58, ¶20). Plaintiff was not 16 when

she was living with Plaintiff. She was 15. This is not a minor inconsistency when one of the issues was K.K.'s age at the time sexual relations began.

Furthermore, while there was no allegation of sexual abuse of his own children, his children were living with him. Thus, a reasonable person might infer that the 2006 safety plan that allowed for supervised contact was specifically developed for Plaintiff's situation (which was in direct violation of the Protocol).

Finally, I disagree with Plaintiff that the Commonwealth Court's opinion does not state that Mr. Davis' opinion was not reasonable. Rather, it concludes that FCCYS failed to meet its burden of proving that Plaintiff was a perpetrator of child abuse. (Docket No. 47-4, p. 8).

Consequently, summary judgment is not warranted on this basis.

b)    Kim Schuessler

Plaintiff asserts that Ms. Schuessler's conduct must be decided under the deliberate indifference conscience shocking standard. (Docket No. 54, pp. 27). Plaintiff argues that Ms. Schuessler had the luxury of time. *Id.* Plaintiff's situation had involved FCCYS for over 10 months and there was a safety plan in place that separated Plaintiff from his children (the children were living with the grandparents and Plaintiff had only supervised contact). *Id.* Thus, Plaintiff concludes that Ms. Schuessler had the time to proceed in a deliberate fashion and to make unhurried judgments. In opposition, Defendants argue that she did not have time to make an "informed decision" because there was an allegation that Plaintiff was having supervised contact with his children, that he was an indicated perpetrator who did not complete treatment, and that this was in violation of the Protocol. (Docket No. 56, pp. 16-17). I disagree with Defendants. Defendants had set up, approved, and abided by the initial safety plan for 10 months. Furthermore, when the phone call came in, Ms. Schuessler called Ms. D'Auria, who was familiar with Plaintiff's case and was aware that Plaintiff had not completed treatment. (Docket No. 47-8, p. 23). Consequently, I find that there were 10 months to review and assess the situation. Therefore, I will apply the deliberate indifference conscience shocking standard.

Plaintiff argues that Ms. Schuessler acted with conscience shocking deliberate indifference to his liberty right to the care, custody, and management of his children on August 1, 2007, when she went to his parents' home with two state police officers to force his parents to agree to ban all contact between

Plaintiff and his children. (Docket No. 54, pp. 24-27). Specifically, a call came in to FCCYS that Plaintiff was having contact with his children. There was no allegation of abuse. Ms. Schuessler was the on-call caseworker at the time.. She did no investigation into the situation involving Plaintiff other than to call Ms. D'Auria who told her he was an indicated perpetrator who had not completed counseling.

So, after 10 months of abiding by the initial 2006 safety plan drafted and approved by FCCYS and without any incidents occurring in the meantime, Ms. Schuessler arrived at Plaintiff's mother's house with two police officers. She presented a new safety plan ("August 1, 2007, safety plan") to Plaintiff's mother, which required her to prohibit all contact between Plaintiff and his children, including "face to face, telephone, e-mail or third-party messages." (Docket Nos. 46 and 55, ¶97, Docket No. 49, p. 23). She told Plaintiff's mother that if she did not agree at that time to abide by the safety plan, the police officers who were with her would assess the children for protective custody, and if they did not feel that the children were safe in the situation, could remove the children. (Docket Nos. 46 and 55, ¶98). The August 1, 2007, safety plan stated that the failure to abide by it "will result in the Agency taking court action for cooperation….[and] may also result in the removal of [the] child/ren from the home for foster care placement." (Docket No. 49, ¶ 23). Plaintiff's mother signed the safety plan, telling Ms. Schuessler that she and her husband would do whatever the agency requested "as they will not risk losing the children over the situation." (Docket Nos. 46 and 55, ¶100). If Plaintiff's mother had refused to sign the safety plan at that time, Ms. Schuessler would have asked the police to assess for protective custody. *Id.* at ¶101.

Based on these facts, Plaintiff argues that this case is, in all material respects, indistinguishable from *Croft v. Westmoreland County Children and Youth Services,* 103 F.3d 1123 (3d Cir. 1997). *Croft* is a substantive due process case. *Id.* In *Croft,* a CYS caseworker went to the Croft home to investigate a call from ChildLine that Dr. Croft was sexually abusing his daughter. *Id.* The caseworker went with a police officer to the home and gave Dr. Croft an ultimatum: "unless he left his home and separated himself from his daughter until the investigation was complete, she would take Chynna physically from the home that night and place her in foster care." *Id* at 1124. The Third Circuit found this to be "blatantly coercive." *Id.* at 1125, n. 1. Coupled with the finding that the CYS caseworker did not have reasonable grounds to any degree of certainty, that the child was sexually abused or was in imminent danger of

abuse, the Third Circuit found that the caseworkers' conduct was an arbitrary abuse of government power.

Similarly, in this case, Ms. Schuessler went to Plaintiff's parents' home with two police officers and told Plaintiff's mother that if she did not agree at that time to abide by the safety plan, the police officers would assess the children for protective custody, and if they did not feel that the children were safe in the situation, could remove the children. (Docket Nos. 46 and 55, ¶98). Additionally, the August 1, 2007, safety plan states that the failure to abide by it "will result in the Agency taking court action for cooperation….[and] may also result in the removal of [the] child/ren from the home for foster care placement." (Docket No. 49, ¶ 23). Based on *Croft,* I find Ms. Schuessler's statements and actions to be so coercive as to be considered an ultimatum.

While I agree with Defendants that the surrounding circumstances in *Croft* were somewhat different from the surrounding circumstances in this case, I nonetheless find that her conduct was an arbitrary abuse of governmental power. The circumstances leading to the ultimatum did not change from the prior 10 months. There was no further degree of risk to his children or evidence of any abuse in the prior 10 months. There were no additional grounds upon which to base a change in the initial 2006 safety plan. Yet, given the same circumstances just 10 months prior, FCCYS drafted, approved, and enforced the initial 2006 safety plan that included supervised visitation. Based on this and coupled with the ultimatum, I find that there is no genuine issue of material fact that Ms. Schuessler's conduct was an arbitrary abuse of government power rising to the level of deliberately indifferent and conscience shocking in violation of Plaintiff's substantive due process right to the care, custody, and control of his children. There was no legitimate reason for the additional governmental interference in Plaintiff's parental rights. Therefore, summary judgment is warranted as to Plaintiff's substantive due process claim against Ms. Schuessler.

c) Renee Coll

Ms. Coll was the caseworker assigned to Plaintiff's case in August of 2007. Plaintiff argues that the deliberate indifference standard should apply in Ms. Coll's case because her interaction with the case came after the August 1, 2007, safety plan was in place. (Docket No. 54, p. 28). Defendants do not

argue otherwise.  *See* Docket No. 56, pp. 17-18.  I agree with Plaintiff and will apply the deliberately indifferent conscience shocking standard.

Plaintiff essentially argues that Ms. Coll treated Plaintiff as if he posed an imminent risk of sexual abuse to his children by refusing to allow him any contact with his children unless and until he participated in treatment, when she, herself, had no personal opinion about whether it was necessary to prohibit contact between Plaintiff and his children.  (Docket No. 54, p. 28; Docket Nos. 46 and 55, ¶187).  Rather, she believed that the no contact safety plan was required based on the Protocol.  (Docket No. 47-9, p. 5).  Thus, Plaintiff argues that Ms. Coll's conduct was deliberately indifferent to his fundamental parental rights in violation of his substantive due process rights.  (Docket No. 54, pp. 28-29).

Defendants' entire response is that Plaintiff's agreement to the safety plan was "voluntary."  (Docket No. 56, p. 17).  I reject this characterization.  There is no genuine issue that it was coercive.  Plaintiff spoke with his parents who told him that his mother already signed a new safety plan requiring her to bar all contact between Plaintiff and his children.  (Docket Nos. 46 and 55, ¶134).  Defendants' suggestion that Plaintiff's mother would somehow let him see his children if he asked her is pure speculation and contrary to the fact that his mother had signed the safety plan and stated she would abide by the safety plan because she "will not risk losing the children over the situation."  (Docket Nos. 46 and 55, ¶99).  The August 1, 2007, safety plan stated that the failure to abide by it "will result in the Agency taking court action for cooperation….[and] may also result in the removal of [the] child/ren from the home for foster care placement."  (Docket No. 49, ¶ 23).  Thus, it is disingenuous, at best, to suggest that Plaintiff could refuse to agree to the plan at this point.

I find there is no genuine issue of material fact that blindly abiding by the Protocol without consideration of its appropriateness rises to the level of deliberately indifferent conscious shocking conduct.  Consequently, summary judgment is warranted as to Plaintiff's substantive due process claim against Ms. Coll.

### 2.  Procedural Due Process

The Third Circuit has succinctly set forth the process for assessing a due process claim.

The Fourteenth Amendment prohibits state action which "deprive[s] any person of life, liberty, or property, without due process of law." To enable individuals to enforce these rights, Congress enacted § 1983 as a federal cause of action against deprivation of any rights, privileges, or immunities secured by the Constitution or laws of the United States.

To state a § 1983 claim, Plaintiffs must demonstrate that Defendants, acting under the color of state law, deprived Plaintiffs of a right secured by the Constitution or the laws of the United States. . . .

To establish a procedural due process claim under § 1983, Plaintiffs must prove (1) a deprivation of an individual interest encompassed by the Fourteenth Amendment's protection of life, liberty, or property, and (2) that the procedures available did not provide due process of law.

*Culinary Service Of Delaware Valley, Inc. v. Borough Of Yardley*, No. 09-4182, 2010 WL 2600683, *4 (3d Cir. June 30, 2010) (citations omitted).  Thus, procedural due process guarantees ensure the opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quotation omitted). Whether the Defendants satisfied this guarantee depends upon a variety of factors:

1)      The private interest that will be affected by the official action;

2)      The risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and

3)      The Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews*, 424 U.S. at 335.

Here, the private interest would be the fundamental liberty interest Plaintiff has in the care, custody and management of his children, which must be balanced with FCCYS' interest in protecting Plaintiff's children from the imminent risk of injury. *See Croft*, 103 F.3d at 1125; *Brown v. Daniels,* 290 Fed. Appx. 467, 472 (3d Cir. 2008).   According to Defendants, there was no due process afforded in this case because "[d]ue process considerations do not yet come into play with these voluntary, negotiated plans."  (Docket No. 56, p. 19).

To that end, Defendants suggest that Plaintiff is not entitled to the procedural due process of challenging the safety plan because state law does not provide for the same since the children were not taken into protective custody.   (Docket No. 56, pp. 18-19).   I reject this notion.   "The procedural component of parental due process rights….requires rigorous adherence to procedural safeguards anytime the state **seeks** to alter, terminate, or suspend a parent's right to the custody of his minor children."  *McCurdy v. Dodd*, 352 F.3d 820, 827 (3d Cir. 2003), *citing Stanley v. Illinois,* 405 U.S. 645, 656-57 (1972) (emphasis added).   In other words, simply because a child was not taken into protective

custody does not mean the parents were not entitled to due process. *See, Brown v. Daniels,* 290 Fed. Appx. 467, 471 (3d Cir. 2008) (Whether a parent was afforded due process cannot end with whether the child was taken into protective custody because it is "well settled that state law does not define the parameters of due process for purposes of the Fourteenth Amendment.").

In *Croft,* as in this case, the father agreed to separate himself from his child until the investigation by CYS was complete. 103 F.3d at 1124-25. While the Plaintiffs in *Croft* did not raise the issue of procedural due process, the Third Circuit specifically stated that "removing the suspected parent from the family home during the pendency of child abuse investigations absent **any** procedural safeguards raises a procedural due process issue." *Id.* at 1126, n. 3 (emphasis added). Thus, contrary to Defendants' assertions in its Brief in support of its Motion for Summary Judgment, some sort of procedural safeguard is required in this case. (Docket No. 45, pp. 11). As in *Croft,* Plaintiff agreed to separate himself from his children until the investigation was complete. In this case, however, FCCYS' investigation was never completed but was simply closed.[2] Thus, Plaintiff's right to the care and custody of his children was altered and, eventually, completely prohibited <u>indefinitely</u> without any procedural safeguards.

Viewed in the light most favorable to Defendants, there is no genuine issue of material fact that there were no procedural safeguards in place for challenging the restrictions placed on Plaintiff and his children. *See,* Docket No. 56, pp. 18-19. Thus, the risk of an erroneous deprivation could never be contested. Consequently, I find the failure to provide <u>any</u> procedural safeguard is a violation of Plaintiff's procedural due process. Therefore, summary judgment in favor of Plaintiff on his procedural due process claim is warranted.

3.    Waiver of Substantive and/or Procedural Due Process

Plaintiff preemptively moves (and Defendants cross move) for summary judgment on the issue of whether he waived his due process rights by complying with Defendants' demands. (Docket No. 54, pp. 34-39). It is well settled that to be valid, a waiver of a constitutional right must be voluntary, knowing, and intelligent. *Erie Telecommunications, Inc. v. City of Erie, Pa.*, 853 F.2d 1084, 1094 (3d Cir. 1988). Additionally, the waiver must be established by clear and compelling evidence. *Id.* In reviewing waiver

---

[2] The case was closed because Plaintiff refused to complete the sex offenders program that required him to take responsibility for his action since he was appealing his indicated status. (Docket No. 47-11, p. 30). Ms. Coll never informed him of any other options.

issues, the Supreme Court "has instructed the courts to 'indulge in every reasonable presumption against waiver' of fundamental constitutional rights and ... '[not to] presume acquiescence in the loss' " of such rights. *Id.* (*quoting Johnson v. Zerbst,* 304 U.S. 458, 468-69 (1938).

Defendants argue that a reasonable jury could find[3] that Plaintiff had sufficient information to make a knowing and intelligent waiver of his due process rights. I disagree. Plaintiff had no information about his rights, substantive or procedural. There is no question that Defendants failed to give him even bare minimum information about his rights. Rather, he was told perfunctorily what Defendants would do if he did not agree to a safety plan, but nothing in any detail or even what would happen under the safety plans. For example, Plaintiff was not given any information about how to obtain information about his children or what to do about medical or education issues or if he could demand immediate return of his children. In fact, at the initial stage, Plaintiff was not even told to obtain a lawyer until after his children were placed in the custody of his parents and was in the conference with FCCYS (4 days later) when *he asked* Mr. Davis if he should get legal counsel. Such information is required when transferring custody of a child to a county agency. 55 Pa. Code §3130.65. Therefore, at a minimum, Plaintiff should have been informed of that information. Additionally, he was not told that he was entitled to a hearing, or who would bear the burden of proof and what would have to be proved at the hearing. Nor was he given the option of placing his children with his parents only temporarily until a court hearing was held.

Moreover, Defendant argues that a reasonable jury could find that Plaintiff was not coerced and made the decision to sign the safety plans voluntarily thereby waiving his due process rights.[4] (Docket No. 56, pp. 3-4). To that end, Defendants suggest that Plaintiff's agreement was not coerced. As set forth above, I disagree.

Based on the same, I find there is no genuine issue that Plaintiff did not waive his substantive and procedural due process rights. The facts and circumstances of this case show that there is no genuine issue of material fact that there was not a valid waiver in this case. There can be no doubt, therefore, that Defendants have failed to come forward with clear and compelling evidence that Plaintiffs' agreements to

---

[3] Defendants fail to acknowledge that such evidence must be clear and compelling evidence.
[4] Defendants fail to acknowledge that such evidence must be clear and compelling evidence.

the safety plans were knowing or intelligent. Thus, summary judgment in favor of Plaintiff that he did not waive his substantive and procedural due process rights is warranted.

### B.    First Amendment Right to Familial Association

Plaintiff claims that the ban on his communication with his children violated his first amendment right to familial association. (Docket No. 54, pp. 39-40). There are two types of association protected by the First Amendment: expressive and intimate. *Roberts v. United States Jaycees,* 468 U.S 609 (1984). "Generally speaking, expressive association protects the ability of individuals to gather in order to pursue political, social, economic, educational, religious, and cultural ends....Intimate association protects the closest and most interdependent of human relationships against state interference." *Schultz v. Wilson*, 304 Fed.Appx. 116, 120 (3d Cir. 2008) (internal quotations and citations omitted); *Roberts v. Mentzer,* No. 09-3251, 2010 WL 2113405, 2 (3d Cir. May 27, 2010). Intimate associations "by their nature involve deep attachments and commitments to the necessarily few other individuals with whom one shares not only a special community of thoughts, experiences, and beliefs but also distinctively personal aspects of one's life." *Pi Lambda Phi Fraternity, Inc. v. University of Pittsburgh*, 229 F.3d 435, 442 (3d Cir. 2000) (*quoting Roberts v. United States Jaycees*, 468 U.S. 609, 619-20 (1984)). At issue in this case is Plaintiff's well recognized intimate familial association with his children.

"Where a policy interferes with core associational liberties, 'it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests.' *Zablocki v. Redhail,* 434 U.S. 374, 388 (1978). For instance, where a governmental regulation substantially interferes with close familial relationships, the most exigent level of inquiry-strict scrutiny- is applied. *See id.* at 383." *Chi Iota Colony v. City University of New York,* 502 F.3d 136, 143 (2d Cir. 2007). Since we are dealing with a familial associational interest between a parent and his children, strict scrutiny will apply in this case.

There is no doubt that the policy at issue significantly interferes with familial association by requiring the prohibition of all communications between an alleged perpetrator and his children until, at the earliest, an offender has successfully completed counseling treatment or he received a recommendation by a recognized offender's therapist that the individual is permitted to be around children. (Docket No. 47-2). There is also no doubt that the August 1, 2007, safety plan, which was

drafted by FCCYS, was based on the policy above, and required Plaintiff to stop any and all communications with his children until the investigation was complete. (Docket Nos. 46 and 55, ¶97, Docket No. 49, p. 23). In this case, it meant that all communication with Plaintiff's children was banned indefinitely, since Plaintiff refused to participate in FCCYS' counseling program to completion. A total ban on all communications, either indefinitely or until certain conditions are met, is the highest interference with Plaintiff's associational freedom FCCYS could have chosen. There is, undoubtedly, a compelling interest in protecting children. The total ban on all communication, however, is not narrowly tailored. Plaintiff offers various less intrusive ways that FCCYS might accomplish its goal of protecting children from indicated perpetrators but that would not completely ban all communications.

In opposition, the only argument made by Defendants is the same argument they raised before: The safety plan was voluntarily agreed to by Plaintiff and Plaintiff could have violated the plan if he wanted, at which time "there was the potential for FCCYS to petition the court for dependency or the matter being referred to the police for their determination of protective custody." (Docket No. 56, p. 20). First of all, this response fails to offer any explanation for how the Protocol, upon which the safety plan is based, is narrowly tailored. Viewing the evidence in the light most favorable to Defendants, I find automatically terminating *any and all* contact between a parent and child based solely on a Protocol that presumes when a parent has been indicated as a perpetrator of sexual abuse of a minor (whether his child or not) all other minors are at imminent risk of danger is overly broad and is not in any way tailored.

Furthermore, once again, I reject Defendants' characterization that the safety plan was entered into voluntarily. As set forth more fully above, I find Plaintiff's agreements to the safety plans were coercive in nature, rising to the level of an ultimatum. *See, Croft, supra.*

Consequently, I find that there is no genuine issue of material fact that Defendants' total ban on Plaintiff's contact with his children was not narrowly tailored to meet FCCYS' interests in protecting his children. Therefore, summary judgment in favor of Plaintiff is warranted as to Plaintiff's First Amendment claim.

IV.     **Defendants' Motion for Summary Judgment (Docket No. 41)**

As I mention in footnote one, *supra,* to the extent Plaintiff and Defendants filed motions on the same issues, I considered the same under Plaintiff's Motion. *See,* footnote one. The only issues

remaining for consideration set forth in Defendants' Motion are: 1) whether summary judgment is warranted as to Mr. Davis' initial conduct with regard to Plaintiff's substantive due process claim; and 2) qualified immunity.[5] I will considered these issues now, viewing the evidence in the light most favorable to Plaintiff.

### A. Substantive Due Process

#### 1. Mr. Davis' initial conduct

With regard to Mr. Davis' initial conduct in Plaintiff's case, Plaintiff concedes that the "indeed shocks the conscience" standard applies. (Docket No. 54, p. 23, n. 47).

Viewing the evidence in the light most favorable to Plaintiff, I find there is a genuine issue of material fact as to whether Mr. Davis' initial conduct shocks the conscience. Specifically, both Plaintiff and K.K. confirmed that there was a relationship, but they stated that they waited until K.K. was 16. K.K. was not living with Plaintiff when she was 16. In any event, Plaintiff was not her guardian when she was living at his house with her father.

Moreover, Mr. Davis never saw or interviewed Plaintiff's children. There was no evidence that Plaintiff's children were abused (nor did the report of abuse relate to his own children). Yet, Mr. Davis required a separation of Plaintiff from his children. Thus, Mr. Davis threatened Plaintiff that if he did not agree to and follow the safety plan (of having his children reside elsewhere with supervised visits only), his children would be removed and placed in foster care, which he was told by Mr. Davis would make it more difficult for him to see his children. (Docket No. 47-5, Ex. E. pp. 16-17). Based on this, Plaintiff did not feel like he had any other choice but to agree to a separation. (Docket No. 47-5, p. 1). Consequently, I find there is a genuine issue of whether Mr. Davis' initial contact shocks the conscience. Therefore, summary judgment is not warranted in Mr. Davis' favor on Plaintiff's substantive due process claim against him.

#### 2. David Madison

---

[5]Defendants appear to argue that under the current state of the law there is not a complete ban on negotiated safety agreements. (Docket No. 45, pp. 9-11). Upon review of Plaintiff's opposition, I note that Plaintiff does not argue the same. In fact, I infer from Plaintiff's opposition that such agreements can be useful under the appropriate circumstances, just not in this case. Consequently, I need not consider such argument.

Defendant argues that David Madison, director of FCCYS, did not violate Plaintiff's civil rights. (Docket No. 45, pp. 25-26). Specifically, Defendants argue that Mr. Madison cannot be personally liable because there is no evidence of any personal involvement sufficient to impose personal liability on him. *Id.* In opposition, Plaintiff argues that Mr. Madison can be held personally liable for his subordinates' actions "if they are taken pursuant to a policy that he approved." (Docket No. 57, p. 16). The Third Circuit has held that '[i]ndividual defendants who are policymakers may be liable under §1983 if it is shown that such defendants, 'with deliberate indifference to the consequences, established and maintained a policy, practice, or custom which directly caused constitutional harm." *A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Cent.,* 372 F.3d 572, 586 (3d Cir. 2004)(*quoting Stoneking v. Bradford Area Sch. Dist.,* 882 F.2d 720, 725 (3d Cir. 1989).

The Protocol was drafted by the agency's policy committee, which is made up of caseworkers, supervisors, and the case manager. There is no doubt that Mr. Madison reviewed and approved the Protocol at issue. There is also no doubt that the case workers, Kim Schuessler and Renee Coll , followed the Protocol in Plaintiff's case. Consequently, summary judgment in favor of Mr. Madison is not warranted.

### B. Fifth Amendment

Defendants argue that the sex offender program does not violate Plaintiff's Fifth Amendment right to be free from self-incrimination. (Docket No. 45, pp. 24-25). Specifically, Defendants argue that the record does not establish, as a condition of involvement in the program, that an offender needs to admit to the act of sexual abuse. *Id.* at 24. A review of the record in the light most favorable to Plaintiff reveals otherwise. According to the Protocol, a perpetrator may not have any contact with children until he successfully completes treatment. (Docket No. 47-2, pp. 1-2). The sex offender program for FCCYS is run by George Yatsko. (Docket Nos. 42 and 58, ¶112). Mr. Yatsko testified that he would not recommend that a perpetrator be allowed supervised visitation with his children unless he takes responsibility for being a perpetrator of sexual abuse. (Docket No. 47-11, pp. 31-32).

Q. So in order to regain contact with his children, Mr. Doe would have to be in the program. Any other requirements that he would have to fulfill?

A. …[T]here are things, yes, in the program that you would definitely have to accomplish. And one would be taking responsibility for any out of control behavior, working, again, as we spoke, a few days ago, about the confidence line

> and the problem solving techniques, all those thing we would work with and help the individual understand what responsibility is.

> Q. So when you say taking responsibility for out of control behavior, in Mr. Doe's case, would that mean taking responsibility for being a perpetrator of sexual abuse against a child?

> A. That's correct. Yes.

*Id.* Based on the same, I find there is a genuine issue of material fact as to what "taking responsibility" means. Thus, summary judgment is not warranted on this ground.

Further, Defendants argue that there is no evidence that any admission in the sex offenders program was ever used against an offender in a criminal proceeding. I find this argument unpersuasive. Just because an admission in FCCYS' sex offenders program has not been used in a criminal proceeding previously, does not mean that it could not be so used. In this case, there was the ever present threat of criminal prosecution based on the assumption that Plaintiff has sex with K.K. prior to the age of 16. The Third Circuit has state that "the availability of the privilege [against self-incrimination] does not turn upon the type of proceeding in which its protection is invoked, but upon the nature of the statement or admission and the exposure which it invites." *Saranchak v. Beard*, 616 F.3d 292, 302 (3d Cir. 2010), *citing In re Gault*, 387 U.S. 1, 49 (1967). Consequently, the simple argument that no admission made in the sex offender program has ever been used against an offender in a criminal proceeding lacks merit.

Consequently, summary judgment in favor of Defendants on Plaintiff's Fifth Amendment claim based on these arguments is not warranted.

### C. Qualified Immunity

Finally, Defendants assert that the individual Defendants are entitled to qualified immunity. (Docket No. 45, pp. 26-27). The doctrine of qualified immunity allows government officials who are performing discretionary functions to be "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity involves two inquiries:

> (1) Do the facts alleged show that a state actor violated a constitutional right, and

> (2) Was the constitutional right clearly established so that a reasonable person would know that the conduct was unlawful?

*Wilson v. Zielke,* No. 09-2607, 2010 WL 2144292, *1 (3d Cir. May 28, 2010) (*citing Bayer v. Monroe County Children & Youth Servs.*, 577 F.3d 186, 191 (3d Cir. 2009) (*citing Saucier v. Katz*, 533 U.S. 194, 201 (2001))). Courts are accorded "discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Id (citing, Pearson v. Callahan*, --- U.S. ----, 129 S.Ct. 808, 818, 172 L.Ed.2d 565 (2009).

For a right to be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Studli v. Children & Youth And Families Central Regional Office,* 346 Fed.Appx. 804, 809, 2009 WL 2873306, 2 (3d Cir. Sept. 9, 2009) (*citing, Saucier*, 533 U.S. at 202 (*quoting, Anderson v. Creighton*, 483 U.S. 635, 640 (1987))).

First, Defendant's section on qualified immunity is set forth in five paragraphs and only two of them apply the facts to law. (Docket No. 45, pp. 26-27). There is no application of law to facts. Rather, those paragraphs are conclusory in nature. *Id.* at 27. Additionally, they fail to separate each individual Defendant's actions. Consequently, I find this section to be inadequately briefed such that I cannot make a well-reasoned decision with regard to each individual's action as required. Therefore, I decline to address the issue.

Nonetheless, I note that the individual Defendants conclude they are entitled to qualified immunity because they did not violate Plaintiff's constitutional rights. (Docket No. 45, p. 27). As set forth above, there is a genuine issue as to whether some of the individual Defendants violated Plaintiff's constitutional rights and in other instances there is no doubt that the individuals violated Plaintiff's constitutional rights. As a result, qualified immunity is not warranted at this time.

An appropriate order shall follow.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JOHN DOE,                                      )
                                               )
    Plaintiff,                                 )
                                               )
    vs.                                        )        Civil Action No. 8-823
                                               )
FAYETTE COUNTY CHILDREN AND                    )
YOUTH SERVICES, *et al.,*                       )
                                               )
    Defendants.                                )

AMBROSE, District Judge

**ORDER OF COURT**

AND now, this 22nd day of November, 2010, upon consideration of the cross motions for summary judgment (Docket Nos. 41 and 44) and all related documents, it is ordered that Defendants' Motion for Summary Judgment (Docket No. 41) is denied and Plaintiff's Motion for Summary Judgment (Docket No. 44) is granted in part and denied in part as follows:

    1.    Plaintiff's Motion for Summary Judgment (Docket No. 44) is granted as follows:

        a.    summary judgment is warranted in Plaintiff's favor as to his substantive due process claims as it relates to FCCYS' Protocol, Ms. Schuessler, and Ms. Coll;

        b.    summary judgment is warranted in Plaintiff's favor as to his procedural due process claims;

        c.    summary judgment in favor of Plaintiff that he did not waive his substantive and procedural due process rights is warranted; and

        d.    summary judgment in favor of Plaintiff is warranted as to Plaintiff's First Amendment claim.

    2.    Plaintiff's Motion for Summary Judgment (Docket No. 44) is denied in all other respect.

It is further ordered that a pre-trial conference is set for December 2, 2010, at 10:30 a.m.

BY THE COURT:

s/ Donetta W. Ambrose
Donetta W. Ambrose
United States District Judge